UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLE INC,<br>          Movant,<br>v.<br>MATCH GROUP, INC.,<br>          Respondent. | Case No. 21-mc-80184-YGR   (TSH)<br><br>**DISCOVERY ORDER**<br>Re: Dkt. No. 1 |

In this miscellaneous action transferred from the Northern District of Texas, Apple moves to compel documents from Match Group that are responsive to Apple's requests for production ("RFPs") 29, 30 and 32. The RFPs were part of a subpoena Apple served on non-party Match in three underlying actions pending in this district: *Epic Games, Inc. v. Apple Inc.*, 20-cv-5640; *Cameron, et al. v. Apple Inc.*, 19-cv-3074; and *In re Apple iPhone Antitrust Litigation*, 11-cv-6714. Match, as you probably know, operates various online dating services, such as Tinder, OkCupid, PlentyofFish, and Match,[1] and these services have related apps that run on smartphone devices, such as the iPhone and Android phones and tablets. Apps are the primary way customers use the services Match provides.

The three underlying lawsuits are all antitrust cases against Apple, alleging that Apple monopolizes the iOS app distribution market and uses that monopoly power to charge supracompetitive commissions to app developers for paid apps and on in-app purchases. To obtain information about relevant subjects such as market definition, Apple and the plaintiffs in the underlying lawsuits have subpoenaed many non-party app developers and other companies that

---

[1] The Court is simplifying. Match Group, Inc. is a holding company, and its subsidiaries operate the various dating services. The Court refers to MGI and its subsidiaries together as "Match," as Match did in its briefing.

Apple contends are part of the relevant market(s). The antitrust trial in the *Epic Games* case is over, so there is no point in forcing Match to produce documents on the basis that they are relevant to the antitrust issues in that lawsuit, because it's too late to use them as evidence.[2] The deadline for Apple to oppose class certification in the two class actions was August 10, 2021, but since a certified class can be decertified later, the Court will assume that documents relating to class certification could still be relevant to the class actions. And, of course, merits discovery is still open in the class actions.

So, let's turn to the dispute.

**A.     The RFPs**

The RFPs in dispute seek the following:

> REQUEST FOR PRODUCTION NO. 29:[3]
>
> DOCUMENTS, INCLUDING COMMUNICATIONS CONCERNING the COALITION INCLUDING its formation, documents of incorporation, bylaws, purpose, objectives, activities, sponsorship, founders, meeting minutes, membership, and fees.
>
> REQUEST FOR PRODUCTION NO. 30:
>
> DOCUMENTS CONCERNING COMMUNICATIONS with any actual or proposed founder or member of the COALITION, INCLUDING Basecamp, Blix Inc., Blockchain.com, Deezer, Epic Games Inc., European Publishers Council, News Media Europe, Prepear Inc., ProtonMail, SkyDemon, and Tile, CONCERNING the COALITION, DEFENDANT, any APP MARKETPLACE, YOUR APP(s), and/or any allegations or suspicion of any anti-competitive conduct or behavior.
>
> REQUEST FOR PRODUCTION NO. 32:
>
> ALL COMMUNICATIONS between YOU and any APP DEVELOPER, INCLUDING EPIC, or any member of the COALITION, CONCERNING:
>
> a. the DEFENDANT'S iOS App Store, INCLUDING any guidelines, policies, and procedures for the DEFENDANT'S

---

[2] Other issues remain untried in the *Epic* case, such as Apple's breach of contract counterclaim. During oral argument, Apple agreed that its subpoena to Match is not directed to these other issues in the *Epic* case and that Apple's relevance arguments relate to the developer and consumer class actions.

[3] As written, RFP 29 is ungrammatical. The Court interprets the RFP as if there were commas after the words "communications" and "Coalition."

2

> iOS App Store;
>
> b. policies, practices, and/or procedures for handling and processing payments for the sale of IN-APP PRODUCTS;
>
> c. the following ongoing litigation, INCLUDING declarations, anticipated oral testimony, or documentary evidence relating to the same:
>
>> i. *In re Apple iPhone Antitrust Litigation.*, Case No. 4:11-cv-06714-YGR (N.D. Cal.);
>> ii. *Lawrence v. Apple Inc.*, Case No. 4:19-cv-02852-YGR (N.D. Cal.);
>> iii. *Cameron v. Apple Inc.*, Case No. 4:19-cv-03074-YGR (N.D. Cal.);
>> iv. *Sermons v. Apple Inc.*, Case No. 4:19-cv-03796-YGR (N.D. Cal.); and
>> v. *Epic Games, Inc. v. Apple Inc.*, Case No. 4:20-cv-05640-YGR (N.D. Cal.).

The dispute between Apple and Match is pretty straightforward. Apple says the RFPs seek relevant documents and do not infringe on the First Amendment privilege. Match disagrees.

**B.      Whether the RFPs Seek Relevant and Proportional Discovery**

Apple's theory of relevance concerns the Coalition for App Fairness (the "Coalition"). Apple has put forth evidence that the Coalition was something created by Epic Games as part of its Project Liberty, an aggressive and sustained legal and media campaign aimed at Apple's control over iOS app distribution and the App Store's high commissions. Internal documents show that Epic did not regard itself as a sympathetic figure because it is a large company, so it decided to build a coalition in the form of a 501(c)(4) entity and have other app developers join it. Apple has provided an unsigned statement of work (admitted in evidence in the *Epic* trial) showing that Epic retained The Messina Group to set up the Coalition, whose purpose is to "define the opposition aggressively – who they are, what they do and their motives while proactively positioning the campaign focus. The Coalition will pitch local and national press, influence conversations on social media, and engage in other earned media efforts." The Coalition has a website (https://appfairness.org) that describes its mission, and on it we learn that Match was one of the founding members, along with Epic Games and 12 other companies.

For its part, Match describes the Coalition more broadly, stating that "the Coalition's activities include (1) political advocacy and lobbying, including engaging Congress, state

3

legislators, and foreign officials on relevant areas of concern (*i.e.*, antitrust legislation and enforcement regarding anti-competitive practices in the mobile app ecosystem); (2) educating the public; (3) public relations; (4) recruiting other app developers and coalition building in support of political advocacy and lobbying; and (5) researching, strategizing, and exchanging information and opinions." Mark Buse Decl. ¶ 7 (Match APPX003, ECF No. 21).

The Court thinks it understands why the Coalition is relevant to the *Epic* case, or at least why Apple thinks so. Epic had a major press strategy that accompanied its lawsuit. The "Coalition for App Fairness" sounds like a groundswell of popular opposition to Apple's policies, but at least in Apple's telling, the organization was actually Epic's idea, and it was created for the purpose of presenting a more appealing public face for the cause Epic was championing, and was apparently bankrolled by Epic and perhaps others.

But as noted, the *Epic* antitrust trial is over. Therefore, the Court must figure out how, if at all, discovery concerning the Coalition is relevant and proportional to the two class actions. RFP 29 seeks documents (including communications) concerning the Coalition, including its formation, documents of incorporation, bylaws, purpose, objectives, activities, sponsorship, founders, meeting minutes, membership, and fees. As written, RFP 29 seeks absolutely every document in Match's possession, custody or control concerning the Coalition. The specific examples of types of documents listed in the RFP (such as documents of incorporation, bylaws and so on), after all, follow the word "including," so just serve as examples. Once you take out the two "including" clauses (because they don't actually narrow the RFP), RFP 29 seeks "documents . . . concerning the Coalition." Definition 11 in the subpoena states that "'document' and 'documents' . . . shall include, without limitation, *any and all* drafts; communications" and about two dozen other types of documents. (emphasis added). Definition 8 in the subpoena states that "'concerning' a given subject shall mean: directly or indirectly comprising, concerning, constituting, containing, discussing, embodying, evidencing, exhibiting, identifying, mentioning, negating, pertaining to, recording, regarding, reflecting, relating to, showing, or supporting a given subject matter." So, putting these definitions together we see that RFP 29 seeks any and all documents mentioning, pertaining to, discussing, regarding, or relating to the Coalition,

4

underscoring the breadth of this request.

Match says "[t]here can be little doubt why Apple wants these documents: to peek behind the curtain of a political opponent." Opp'n at 1, ECF No. 19. Match decries "Apple's stated justifications" as "transparent pretext," and says the true purpose of this motion to compel is to "force a non-party to turn over to a public policy opponent its internal communications." *Id.* (simplified). The Court cannot read minds to know Apple's true intentions, but it also doesn't need to. Rule 26 limits discovery to what is relevant and proportional to the needs of the underlying cases, and much of what Apple is requesting does not meet that standard. The Coalition's lobbying activities, for example, are not relevant to class certification or the merits. Apple does not need to know which politicians the Coalition has been lobbying, how many meetings they have had, which foreign officials in which countries the Coalition has been talking to, and what public education efforts the Coalition has undertaken in order to effectively oppose class certification or defend the cases on the merits. Neither are draft public statements by the Coalition, emails among Coalition members about what the Coalition's website should say, or brainstorming emails about public relations strategies relevant to the legal and factual issues presented in the class actions. The next section of this order will discuss the First Amendment concerns that arise from this attempt by Apple to take discovery into the inner workings of its public policy opponent. But for now, it is sufficient to note the sweeping overbreadth of this RFP, which is not at all limited to discovery that is relevant and proportional to the needs of the class actions.

Even if we scrap the broad request for "documents . . . concerning the Coalition" and just limit RFP 29 to the second including clause ("its formation, documents of incorporation, bylaws, purpose, objectives, activities, sponsorship, founders, meeting minutes, membership, and fees"), the Court still cannot understand how all of this is relevant and proportional to the needs of the class actions. How will the Coalition's documents of incorporation and bylaws shed light on whether the developer and consumer proposed classes should be certified or whether their antitrust claims against Apple have merit? For any organization, meeting minutes tend to be sparse, but here those minutes would presumably record the activities of the Coalition, and Apple has not

explained why the details of its media and political campaign would be evidence that is relevant to class certification or the merits of Plaintiffs' claims or Apple's defenses.

As the Coalition has an entire website explaining its purpose and objectives, why should Match be compelled to produce documents about those subjects? Also, in the class actions, why do we care what the Coalition's purpose and objectives are? In the *Epic* trial, the fact that Epic came up with the idea for the Coalition shed light on its Project Liberty, but the class actions are about thousands of developers and millions of consumers. That some portion of the proposed developer class banded together to form the Coalition doesn't seem to shed light on anything.

Neither does the Court see the relevance of the Coalition's membership, founders or sponsorship. It might be true that certain types of app developers have joined or sponsored the Coalition and that they are not representative of app developers overall. We can infer that app developers that have joined or sponsored the Coalition support its mission, but Apple has not provided a reason to think that the failure to join or sponsor the Coalition means anything at all. Even for extraordinarily well known organizations, which the Coalition is not, you can't infer anything from someone's failure to join or sponsor, say, the NAACP or the National Organization for Women. Apple does not explain what relevant facts would be revealed, or what inferences could be drawn, from evidence about the Coalition's members or sponsors.

Likewise, the Coalition's fees and activities do not seem relevant to the class actions. Why does it matter how much an app developer has to pay to join the Coalition? How will that show that common questions do or do not predominate among the proposed developer class, or that Apple has or has not exercised monopoly power? The details of the Coalition's activities will presumably show a media and political campaign against Apple's policies, but those public relations materials are not themselves evidence of anything. This proposed discovery is not proportional to the needs of the class actions.

RFP 30 seeks (with some simplification) Match's communications with actual or proposed Coalition members concerning the Coalition, Apple, any app marketplace, Match's apps, and anti-competitive conduct. This RFP suffers from the same problem as RFP 29 in that it seeks every communication between Match and other Coalition members (and proposed Coalition members)

about the Coalition or about Apple, no matter what the subject of the communication is. This sweeps in all discussions of the Coalition's media and political campaign against Apple, including discussions of lobbying activities, recruitment efforts, public education efforts, and so on, that are unlikely to be relevant to class certification or the merits of the class actions. As with RFP 29, this RFP walks right into Match's accusation that Apple is trying to use discovery to learn what its enemies have been up to, and it does not seem in any way targeted to what is relevant and proportional to the needs of the underlying cases.

Apple says it wants to find evidence of "the harm or benefits the developers perceive from the App Store and the policies at issue," "the importance to them of Apple's security and privacy features for app development and customer acquisition," "the varying monetization strategies that developers are able to deploy," and "individualized differences between developers." Mot. at 5. Yet there is a strange misalignment between what Apple says it wants to take discovery about and what its RFP actually asked for. This RFP did not ask for documents concerning the harm or benefits developers perceive from the App Store, or concerning the importance to developers of privacy and security, or concerning app monetization strategies, and so on, and then leave it to Match to go find those in its internal documents or external communications. Instead, Apple asked for all communications between Match and other members or proposed members of the Coalition concerning the Coalition or Apple, whether or not those communications have anything to do with these subjects. Thus, relevant documents would be responsive only by accident because the RFP is not drafted in terms of relevant subjects.

To be sure, the document dump[4] envisioned by RFP 30 would probably include some relevant documents. However, the Court's responsibility under Rule 26 is to limit discovery to what is proportional to the needs of the class actions, and under Rule 45 it is to avoid undue burden. The wholesale production of communications with other actual or proposed Coalition

---

[4] Match's Mark Buse stated in his declaration that Match's IT department ran preliminary searches to determine the burden on Match if it were forced to produce responsive documents. Buse's inbox alone contains more than 1,600 emails with the Coalition members specifically named in Apple's subpoena, and that is not even counting any emails with more than 50 other non-Coalition-member app developers, which Match would also have to review for responsiveness if the Court enforced RFP 32. Buse Decl. ¶¶ 20, 21 (Match APPX007, ECF No. 21).

7

1  members about the Coalition or about Apple is not proportional to the needs of the cases and
2  would be an undue burden, even aside from the significant First Amendment concerns presented
3  by this motion.

4  RFP 32 seeks (with some simplification) communications between Match and any app
5  developer or member of the Coalition concerning (a) the App Store, (b) policies concerning the
6  sale of in-app products, and (c) five lawsuits pending against Apple in this district.  Subjects (a)
7  and (b), especially subject (a), are substantially overbroad because they sweep in every
8  communication about the Coalition's media and political campaign against Apple, which is all
9  about the App Store.  *See* https://appfairness.org/our-vision/ (the Coalition's "vision for the
10 future" consists of ten "App Store Principles").  Emails describing lobbying efforts to get
11 Congress or the states to regulate the App Store, summaries of discussions with foreign officials to
12 try to get their countries to take regulatory action toward the App Store, drafts of public relations
13 statements about the App Store, efforts to recruit more developers to create public pressure on
14 Apple to change its App Store policies – these are all sought by this RFP and are highly unlikely
15 to be relevant.  And remember:  Because Match is a founding member of the Coalition, it is more
16 likely than most developers or more recent Coalition members to have these kinds of political and
17 media-oriented communications that are untethered to the legal or factual issues that are relevant
18 to class certification or the merits.  Subjects (a) and (b) are therefore not proportional to the needs
19 of the cases.

20 For subject (c), Apple is clear that it wants communications with Match's *counsel* (Mot. at
21 1) because "Apple is entitled to know the degree to which Match and the Coalition are
22 coordinating with the class plaintiffs," *id*. at 3, and because Apple wants to learn "whether there
23 was some grander level of coordination between litigants suing Apple," *id*. at 7.  Assuming for the
24 sake of argument that coordination between Match or the Coalition, on the one hand, and the class
25 Plaintiffs, on the other, is a relevant subject, that information can be obtained from the Plaintiffs in
26 the underlying actions.  Federal Rule of Civil Procedure 26(b)(2)(C)(i) provides that the Court
27 must limit the extent of discovery otherwise permitted by the rules if the discovery "can be
28 obtained from some other source that is more convenient, less burdensome, or less expensive . . ."

8

In general, party discovery is more convenient and less burdensome and expensive than subpoenaing a non-party for the same information.[5]

RFP 32, of course, is written very broadly and requests communications between Match and "any" developer on the listed subjects, not just the class Plaintiffs. However, Apple's argument in its motion to compel about discovery from Match's counsel focuses on coordination with "litigants suing Apple," and on pages 3 and 7 of its motion, Apple seems to use the word "coordinate" to mean *helping with a lawsuit*. Accordingly, Apple's desire through subsection (c) of RFP 32 to learn about efforts to coordinate with those who are suing it does not justify producing communications between Match and app developers that are not suing Apple.

For all three RFPs, Apple's back up relevance argument is that responsive documents could be relevant to bias, if Match is called as a witness to testify at trial. That argument does not in any way address the Court's concerns, discussed above, about the overbreadth and disproportionality of the RFPs. Nonetheless, let's think about that bias argument. Normally, bias is something that an individual has or does not have, and Apple's RFPs do not ask for documents from anybody in particular at Match. Apple's theory of bias seems to be that Match's participation in the Coalition (which responsive documents would presumably show) will be evidence that any witness who is employed by Match is likely to be biased against Apple. Bias in favor of the perspective held by one's employer can be real, but in this case it does not justify any discovery. The home page of the Coalition's website lists Match as a founding member and contains a full-throated attack on Apple's policies at issue. It is perfectly clear where Match stands as a company. And since Apple makes no argument in its motion to compel that there are particular individuals at Match who it wants to prove are biased, it needs nothing further to substantiate its argument that Match as a company is biased against Apple. Regardless, even if some additional documents might be helpful to further flesh out the degree of Match's bias, for the

---

[5] One of the listed lawsuits is the *Epic* case. Of course, Apple cannot get additional discovery from Epic about any coordination with Match or the Coalition because fact discovery is closed in that case. Regardless, whatever the relevance of litigation coordination may be, the antitrust trial in the *Epic* case is over, and Apple agreed at oral argument that this subpoena is not seeking discovery for the remaining issues at play in the *Epic* case. *See* n.2, above.

reasons explained above, these RFPs are overbroad and disproportional to that goal.

For all of these reasons, the Court concludes that RFPs 29, 30 and 32 do not seek relevant and proportional discovery or are otherwise improper.

The next question is what the Court should do about that. Specifically, should the Court rewrite Apple's RFPs to make them narrower? The Court thinks the answer is no. First, the party seeking discovery should write its RFPs because it knows what it wants. Here, the Court's major concern with Apple's RFPs is that they seek broad discovery into a media and political campaign that is largely irrelevant to the class actions. But if those documents are what Apple cared most about getting, then narrowing Apple's RFPs would burden both Apple and Match with narrowed RFPs for things Apple doesn't want or doesn't want very much. Second, the parties briefed this dispute as all-or-nothing. It is best for the Court to rule on the dispute as it has been presented, rather than try on its own to come up with a compromise that neither side suggested.[6]

Accordingly, Apple's motion to compel is denied.

## C. Whether the RFPs Are Barred by the First Amendment Privilege

Because Apple can appeal this order, the Court should also address Match's argument that Apple's RFPs are barred by the First Amendment privilege. But first the Court must determine whether Match waived the privilege by failing to timely assert it.

### 1. Whether Match Waived the First Amendment Privilege

Objections to a subpoena are due before the earlier of the time for compliance or 14 days after the subpoena is served. Fed. R. Civ. P. 45(d)(2)(B). Here, both of those days were December 23, 2020, and Match's December 23 objections stated that "Respondent objects to the Subpoena to the extent that it seeks information that may be protected by the attorney-client privilege, the work-product doctrine, the joint defense privilege, common interest privilege or any other privilege." Apple asserts, and Match does not deny, that the first time Match specifically asserted the First Amendment privilege was in June 2021. The Court agrees with Apple that this

---

[6] *See* Opp. at 12 (arguing that because Apple did not demonstrate the relevance of the requested documents "there has been no reason for Match to discuss potential compromises to reduce its burden"); Reply at 7, ECF No. 24 (criticizing Match for taking that approach, but also confirming that the parties have not discussed potential compromises).

privilege was not timely asserted under Rule 45. The catch-all reference to "or any other privilege" in Match's December objections was not an assertion of the First Amendment privilege but reads like a reservation of rights to assert other privileges that Match might think of in the future. However, Match did not have that right to reserve, as all objections were due by December 23.

Nonetheless, despite the First Amendment objection being untimely, there is case law finding "that where a constitutional privilege is involved a trial court possesses the discretion not to find waiver." *In re DG Acquisition Corp.*, 151 F.3d 75, 81 (2d Cir. 1998). "This is particularly true . . . when the alleged waiver is accomplished by inaction rather than action." *Id*. The Court declines to find a waiver of the First Amendment privilege here. The six month gap between the December 2020 objections and the first specific invocation of the First Amendment privilege in June 2021 is not as bad as it looks because for about half of that time (*i.e.*, between the close of fact discovery in the *Epic* case and the end of the *Epic* trial) Apple largely dropped communications about this subpoena. *See* Brandon Kressin Decl. ¶ 8 (Match APPX010, ECF No. 21). Apple basically parked this subpoena for several months, and its current motion to compel relies heavily on trial exhibits and trial testimony from the *Epic* trial in May of this year. There is nothing necessarily wrong with Apple letting this subpoena sit for a while and then moving to compel with materials it gathered in the meantime against an opponent who could very well have thought it had nothing further to do. However, that approach partially explains why it took Match some time to assert this specific privilege.

Also, it bears remembering that Apple's subpoena contained 33 RFPs. So far as the record before the Court discloses, it appears that Apple's May 27, 2021 meet and confer letter was the first time Apple specifically focused on the Coalition-related RFPs (*see* Match APPX029-030, ECF No. 21), and was the first communication since February to alert Match that Apple did not consider the subpoena resolved. This did prompt the First Amendment objection. *See* Jay Srinivasan Decl. ¶ 4 (Apple APPX002, ECF No. 3). Thus, although Match should have asserted the First Amendment privilege last December, it did promptly assert it once the specific discovery dispute that implicated this privilege crystallized. In the context presented here, that was good

11

enough to avoid a waiver of a constitutional privilege.  There was certainly no prejudice to Apple, which does not claim it took or failed to take any actions in reliance on Match's not asserting a First Amendment privilege.

### 2. The First Amendment Privilege

Turning to the merits, a claim of First Amendment privilege is subject to a two-part test. First, the party asserting the qualified privilege must make a *prima facie* showing of arguable First Amendment infringement.  This *prima facie* showing requires the party to demonstrate that enforcement of the discovery requests will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights.  *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010).  Second, if the litigant can make the necessary *prima facie* showing, the evidentiary burden then shifts to the requesting party to demonstrate that the information sought through the discovery is rationally related to a compelling government interest and is the least restrictive means of obtaining the desired information.  *See id*. at 1161.  "More specifically, the second step of the analysis is meant to make discovery that impacts First Amendment associational rights available only after careful consideration of the need for such discovery, but not necessarily to preclude it." *Id*.  The question is therefore whether the party seeking the discovery has demonstrated an interest in obtaining the disclosures it seeks that is sufficient to justify the deterrent effect on the free exercise of the constitutionally protected right of association. *See id*.  The Ninth Circuit has made clear that the First Amendment privilege is weaker when the speech at issue is of a commercial nature, as opposed to political, religious or literary speech.  *See generally In re Anonymous Online Speakers*, 661 F.3d 1168, 1177 (9th Cir. 2011).

Here, as applied to communications between Coalition members and other documents internal to the Coalition (such as meeting minutes), the associational rights of Match, the other Coalition members and the Coalition itself are both commercial and political in nature.  The commercial aspect hardly needs explanation.  Apple generates vast sums from the commissions it charges paid app developers and from commissions on in-app purchases.  The developers who are members of the Coalition have a financial stake in challenging those commissions, as well as the

App Store's exclusive role in distributing iOS apps. At the same time, the Coalition is engaged in a media and political campaign against Apple's policies, which are the subject of scrutiny by Congress, regulators, and foreign countries, *see, e.g.,* 19-3074 ECF No. 305 at 5-6 (discussing testimony by Apple's CEO Tim Cook to the House Judiciary Committee concerning Apple's commissions on paid apps), and which are part of a larger political debate about the power wielded by Big Tech and the role that antitrust law should play in limiting that power. The Coalition's speech, and the associational rights that give rise to that speech, are therefore political too, and they do not cease to be political merely because the Coalition's cause aligns with its members' financial interests, as is often the case in politics.

Match has established a *prima facie* case that Apple's RFPs, insofar as they relate to the Coalition, infringe its First Amendment rights. The Coalition is a public advocacy organization. It is not a trade association, as Apple contends, that merely pursues issues of interest to the members of an industry. It was formed to advocate for a specific cause, and members join to support that cause. So far as the Court is able to discern, issue-related public advocacy is essentially all that the Coalition does. Turning over the Coalition's internal communications *to Apple* – its public policy opponent – would chill any further participation in the organization. *See Whole Woman's Health v. Smith*, 896 F.3d 362, 373 (5th Cir. 2018) (reversing discovery order and noting that "[e]ven more disturbing, this discovery order forces TCCB to turn over *to a public policy opponent* its internal communications") (emphasis original). Who in their right mind would want to participate in a public advocacy organization, knowing that all their internal communications about strategy, lobbying, planning, and so on, would be turned over to their principal opponent? Once people realize that the Coalition's documents and internal communications have been turned over to Apple, no one will want to join or remain in the Coalition.[7]

Match has submitted evidence that it joined the Coalition with the expectation that

---

[7] The Court therefore finds unpersuasive Apple's argument that Match can designate its documents as confidential under the terms of the protective order in this case. The First Amendment problem is not so much that public disclosure would chill participation in the Coalition, but that disclosure to Apple would do so.

communications among Coalition members would remain confidential and that compelled disclosure would chill its participation. Mark Buse Decl. ¶¶ 13-15 (Match APPX005, ECF No. 21). Further, the fact that the Coalition's membership agreement requires all members to maintain the confidentiality of the Coalition's communications, *id*. ¶ 13, is a strong indicator that other Coalition members relied on a similar expectation of confidentiality. In addition, despite Apple's insistence that it does not engage in retaliatory actions, the heavy dependence that app developers have on access to Apple's App Store would give rise to a legitimate fear of retaliation in the event these communications were disclosed to Apple. *Id*. ¶¶ 16-17 (Match APPX006).[8] Not every app developer is Epic Games, willing to spend a fortune on a public brawl with Apple. In assessing the potential chilling effect that would result from a compelled disclosure, the Court must be mindful of the realistic effect the disclosure would have. *See Perry*, 591 F.3d at 1162-63 ("Implicit in the right to associate with others to advance one's shared political beliefs is the right to exchange ideas and formulate strategy and messages, and to do so in private. Compelling disclosure of internal campaign communications can chill the exercise of these rights."). Realistically, it is difficult to see the Coalition surviving as an effective public advocacy organization if its internal communications are turned over to Apple.

Turning to the second prong of the legal test, the Court must now balance the First Amendment injury against "a sufficient need for the information." *Id.* at 1165. But here, the Court finds that there is nothing on the other side of the scale. As explained in the previous section of this order, even aside from the First Amendment privilege, the Court would deny Apple's motion to compel because the information sought is not relevant and proportional to the needs of the underlying cases. *A fortiori* Apple's motion to compel does not satisfy a heightened

---

[8] Spotify's Chief Legal Officer Horacio Gutierrez testified before the Senate Judiciary Committee that he had "spoken with dozens of developers who have looked on with frustration as Apple has engaged in exclusionary and predatory conduct without any accountability. Many of them are afraid to speak publicly, fearing retribution from Apple that could end their businesses." Testimony of Horacio Gutierrez, U.S. Senate Judiciary Committee, Subcommittee on Competition Policy, Antitrust, and Consumer Rights, Apr. 21, 2021, at 5. *See also* Ben Thompson, *Rethinking the App Store*, Stratechery (Aug. 25, 2020), https://stratechery.com/2020/rethinking-the-app-store/ ("[N]one of the [twenty-one] developers were willing to go on the record for fear of angering Apple.").

14

standard under the First Amendment.

**D.     Conclusion**

Apple's motion to compel is denied.

**IT IS SO ORDERED.**

Dated: August 19, 2021

_____
THOMAS S. HIXSON
United States Magistrate Judge